**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA**

**v.**

**MARSHALL DAY,**

**Defendant.**

**Case No. 25-cr-343 (JMC)**

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this Memorandum in Aid of Sentencing in the above-referenced case. For the reasons set forth below, the government recommends a sentence of 120 months of incarceration, followed by 10 years of supervised release.

## FACTUAL AND PROCEDURAL BACKGROUND

On Wednesday, October 8, 2025, an FBI Task Force Officer (TFO) working with the Washington Field Office was acting in an undercover (UC) capacity as part of the Metropolitan Police Department-Federal Bureau of Investigation (MPD-FBI) Child Exploitation Task Force, operating out of a satellite office in Washington, D.C. In that capacity, the UC entered a fetish website. Different areas of this site are known to the UC as places where people meet, discuss, and trade original images of underage children, links containing child pornography. The UC posted a group message to the website stating that he was a 39-year-old single dad of a young daughter and that he was "open-minded." On October 8, 2025, a user with the screen name "KingDaddy89"

and stating his location to be Largo, MD, later identified as Marshall Day (DAY or Defendant), initiated a private message chat with the UC within the fetish website.

The following is the chat between DAY and the UC on the fetish website on October 8, 2025:

KingDaddy89: How’s it going? If you have a woman who’s down for mfm. I’m down to join. Let me know if you have someone or think you can find someone.

UC: Where else do you like to chat

KingDaddy89: Telegram or KIK. Which one works for u?

UC: Telegram

KingDaddy89: Cool what’s… ur name on there?

UC: @PervyRob what’s yours so I know it’s you

KingDaddy89: Im @KINGDADDY89 on telegram

On Wednesday, October 8, 2025, the UC sent a message on Telegram to the DAY. DAY responded, “Hey” “Im down for mfm or whatever u might be able to put together.” The following is a portion of the text messages sent between the UC and DAY:

UC: What kind of limits do you have, and are you in taboo because I have a girl in my life

DAY: Im very much into taboo (devil emoji). No real hard limits

UC: I think we may like minded

DAY: I think so as well. When are you looking to have some fun? What are your limits with the girl in your life

UC: Absolutely no violence and no anal yet

DAY: I can respect that (100% emoji) Any pics? Free tonight?

The UC then sent a photograph showing his purported 9-year-old daughter.[1] DAY responded with a 'fire' emoji.

UC: Unfortunately not free tonight

DAY: When are you free? I would like to plan something asap

UC: She's with her mom today and tomorrow maybe Friday during day if you want

DAY: Ok thay works. What area do you live in

UC: Chinatown area.

DAY: Ok

UC: Don't want it to be weird Friday so I want to make sure age is not going to be an issue.

DAY: It won't be weird. Its not an issue for me.

UC: Ok and she's 9 and when we play it's more like a game you cool with that?

DAY: Yeah. How does the game usually go? So I know exactly what to do or say.

UC: Awesome usually tickling then move forward from there what would want to do? How far?

DAY: How far has she gone

UC: Loves oral and she rides me.

DAY: Nice I love oral

UC: So you want her to just give you oral

[1] This is not a picture of an actual child.

DAY: Are you, or are you affiliated with law enforcement? This isn't some type of set up, is it?

UC: Fuck no I'm not. [The UC then sent a photograph of his purported penis and a pair of children's underwear.]

DAY: Gotta be sure

UC: Your not right.

DAY: Huh. What do you mean.

UC: Making sure you're not a cop too. So?

DAY: Not a cop or affiliate.

UC: Ok cool I was asking what you wanted to do with her because I don't want any surprises with her.

DAY: Oh ok Oral is cool. We can work in to other stuff, the more I visit.

UC: Perfect I hope this isn't a one time thing I love watching her suck my buddies cuck but he lives in Colorado.

DAY: Definitely won't be one time.

UC: Perfect great really meeting and name is actually [redacted]

DAY: Nice meeting you as well. Im Mike. I think this is the start of a great friendship.

UC: Absolutely.

DAY: Can I ask a question

UC: Anything man.

DAY: How do you keep her from saying anything to her mom? You said she's with her now... or is her mom also taboo?

UC: She knows it's a little game that's played with dads and friends.

DAY responded, Ok cool.

UC: Yeah it's amazing and if she didn't love playing I never would.

DAY: That's what makes it great. She loves playing.

UC: Absolutely it's crazy very lucky.

DAY: Very lucky indeed.

UC: So you live in Largo MD

DAY: Yeah

UC: That's not to bad of a drive is it

DAY: Not at all

UC: Nice glad we met man this is going to be fun.

DAY: Definitely goanna be fun. Its not too big for her is it?

UC: [provides phone number] if you want to text. Definitely going to have to take it slow with her.

DAY: Im cool with that. I just texted u.

As noted above, during the chat on Telegram, the UC messaged DAY his telephone number. At that point, the UC received a text message from the phone number 301-466-XXXX. A portion of the chat is as follows:

DAY: Hey! Its Mike

UC: Hey Mike

DAY: Honestly happy we became friends. Can't wait til Friday

UC: Yeah Me too

On October 9, 2025, the UC and DAY agreed to meet at 11:30AM in Washington, D.C. the next day (October 10, 2025). The UC stated to DAY, "I was thinking you said you were in Largo?

Do you think they'll be any traffic issues for you coming into DC?" to which DAY replied, "It should be fine."

DAY asked the UC if other people responded to his post on the fetish website. The UC said he wasn't comfortable with other people who responded. DAY said, "I was gonna say no need to respond to the rest… because u found ur guy." The UC asked DAY if he wanted to do "more than oral," and advised DAY to bring condoms if so. DAY responded, "You think she can handle more with me," "I think it might be too much with the condom… but u kno better than me what she can handle," "I would definitely take it slow." DAY later asked the UC, "Where should I finish when getting oral." The UC did not respond until the morning of October 10, 2025, texting good morning to DAY. DAY asked again, "But where do you usually finish, when playing."

On the day of travel, October 10, 2025, when DAY texted, "Having car trouble. I think I just need a jump." At some point DAY switches to considering using the Metro to travel into D.C. A portion of the chat from the phone number 301-466-XXXX. is as follows:

DAY: Could we reschedule for maybe tonight? I can use my cousin's car tonight.

UC: Damn man we leaving for the long weekend later tonight

DAY: I do apologize. Please know that im not flaking.

UC: The Metro can't work

DAY: Looking for my smart trip card.

UC: Any luck man? Seems like this is probably not happening?

DAY: May have to wait for u guys to return.

UC: Ok that sucks but if you can't make it

DAY: I was ready. It's literally all I've been thinking about

UC: But the metro can't work?

DAY: Let me see how long it will take

[*some messages skipped]*

DAY: Im just not a huge fan of riding the metro

UC: OK well let me know if I'm staying and waiting or if you don't want to come either way just want to know man

DAY: Would you guys be willing to come to my place?

UC: Yeah not taking that risk with her we had a good plan let's just forget it man it's cool

DAY: Fuck! Im gonna get on the train. Its about a 45 min ride. Can u meet me at gallery place.

On October 10, 2025, at approximately 1:38 pm DAY arrived at the prearranged location and sat down next to the UC. The UC asked if he was 'Mike,' and DAY indicated that he was. DAY was placed under arrest at that point by members of the FBI/MPD Child Exploitation Task Force.

Investigators conducted a custodial interview, at which time DAY waived his Miranda rights and agreed to give a statement. During the course of the interview, he admitted that he traveled from Largo, Maryland to Washington, DC to meet with the UC. He stated that he was not sure if the UC was involved in role-playing or not, and that if there was a real 9-year-old girl, he would not do anything sexual with her.

While traveling from Maryland to DC, DAY had in his possession his cellular phone, which is a black Samsung phone with a blue case (IMEI: 351783150709935). In the download folder, DAY stored six (6) videos depicting child sex abuse materials and two (2) images, which involved the following:

- Video File: 1_4940957268108641782 – a two-minute and two-second video file that depicted a prepubescent girl wearing pink pants and unclothed from the waist

up. A Black male wearing a black sweatshirt is orally penetrating the prepubescent girl with his erect penis. The prepubescent girl has no breast development, no pubic hair, is very small in stature, and has very young facial features.

- Video File: d5f5ff00-a5ce-11f0-b006-2960499a9355 – a three-minute and thirty-two-second video file of a collection of prepubescent children in different states of dress being vaginally, anally, and orally penetrated by adult males. The prepubescent girls have no breast development, no pubic hair, are very small in stature, and have very young facial features.
- Video File: d5f62610-a5ce-11f0-8d23-c5046b306b95 – a forty-six-second video file depicting a prepubescent girl lying on a bed, only wearing pink socks with a grey rabbit stuffed animal in her mouth, being vaginally penetrated by an adult male's erect penis. The prepubescent girl has no breast development, no pubic hair, is very small in stature, and has very young facial features.
- Video File: d5f62610-a5ce-11f0-8823-1d2dc68651e3 – a one-minute and four-second video file focusing on the vagina of a prepubescent girl. The girl is lying on a bed, wearing only a white shirt. An adult male’s erect penis is penetrating the girl vaginally. The prepubescent girl has no pubic hair and is very small in stature.
- Video File: e5d223a0-a492-11f0-bdd2-a58c4d17df7f – a twenty-nine-second video file focusing on the vagina and anus of a prepubescent girl. The girl is lying on a bed, wearing multicolored leggings around her thighs. An adult male's erect penis is penetrating the girl's anus. The prepubescent girl has no pubic hair and is very small in stature.
- Video File: e5d223a0-a492-11f0-bedb-2b0e2aab5e87 – a one-minute and fifty-one-

second video file depicting a prepubescent girl kneeling on a bed, unclothed, being vaginally or anally penetrated by an adult male's erect penis. The prepubescent girl is very small in stature.

- Image File: -4952194654901634407_1109 – an image depicting a young child being orally penetrated by an adult male's erect penis. The child has very young facial features and is small in stature.
- Image File: -4906836450181383615_1109 – an image depicting a young child being orally penetrated by an adult male's erect penis. The child has very young facial features and is small in stature.

These videos were downloaded from Telegram and Teleguard. The videos were downloaded between October 8, 2025, and October 10, 2025. The images were downloaded from Telegram on May 13, 2024, and July 18, 2025, to DAY's phone. DAY knew that all six of these videos and both images were contained on DAY's phone when he traveled using the Metro train from Largo, Maryland to Washington, D.C. on October 10, 2025.

DAY acknowledges that he has no legal defense or justification for possessing videos and images depicting child sexual abuse materials on his phone or for traveling with those images from Maryland to D.C. on October 10, 2025.

The defendant was indicted on four counts: Travel with Intent to Engage in Illicit Sexual Conduct, Transportation of Child Pornography, Receipt of Child Pornography, and Possession of Child Pornography. On March 12, 2026, the Defendant plead guilty to one count of Transportation of Child Pornography in violation of 18 USC §§ 2252(a)(1). His sentencing is currently scheduled for September 3, 2026.

## DISCUSSION AND RECOMMENDATION

### I. Generally Applicable Legal Principles

In *United States v. Booker*, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in *Blakely v. Washington*, 124 S. Ct. 2531 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, 18 U.S.C. § 3553(b)(1). *Booker*, 125 S. Ct. at 756.

In post-*Booker* cases, the Supreme Court has stated that a district court should begin all sentencing proceedings by correctly calculating the applicable guidelines range. *See United States v. Gall*, 552 U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."). After giving both parties an opportunity to argue for an appropriate sentence, the district court should then consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). *Id.* These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1)); the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment (18 U.S.C. § 3553(a)(2)); the kinds of sentences available (18 U.S.C. § 3553(a)(3)); the Sentencing Guidelines and related Sentencing Commission policy statements (18 U.S.C. § 3553(a)(4) and (a)(5)); the need to avoid unwarranted sentencing disparities (18 U.S.C. § 3553(a)(6)); and the need to provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7)).

## II. 2021 Sentencing Commission Report

In 2012 and 2021, the U.S. Sentencing Commission published reports to Congress analyzing federal sentences in both production and non-production child pornography offenses. The reports call into question the applicability of several of the enhancements that apply in the instant matter including use of a computer and the number of images. These issues have been before Congress repeatedly, and Congress has declined to change the guidelines. Moreover, in the instant matter, each of these enhancements is and should be considered aggravating factors. In particular, Mr. Day not only used a computing device to distribute material online, but he specifically used Teleguard and Telegram, applications known to be heavily encrypted, to avoid law enforcement detection. He did not merely use these applications to view images, but instead to engage in an online community of individuals with whom he could share images of the rape and torture of young children. Thus, the enhancement for use of a computer should apply.

Additionally, while the reports questioned certain enhancements in the current Guidelines, they also recommend three categories of aggravating factors that courts should consider when imposing sentences in non-production cases: content, community, and conduct. The Commission further explained how these factors should affect a defendant's sentence:

> The presence of aggravating factors from any of these three categories, even without the presence of any aggravating factors from the other two categories, warrants enhanced punishment depending on the degree that aggravating factors from that category are present in a particular case. The presence of aggravating factors from multiple categories generally would warrant a more severe penalty than the presence of aggravating factors from a single category.

U.S. Sent'g Comm'n, Report to Congress: Federal Child Pornography Offenses (2012) at 321 (hereinafter 2012 Report).

*Content*

As outlined in the 2012 Report, this factor directs courts to evaluate the content of an offender's collection and behavior "in terms of volume, the types of sexual conduct depicted in the images, the ages of the victims depicted, and the extent to which an offender has organized, maintained, and protected his collection over time, including through the use of sophisticated technology." 2012 Report at 320.

*Community*

This factor directs the Court to evaluate "the degree of an offender's engagement with other offenders — in particular, in an Internet 'community' devoted to child pornography and child sexual exploitation." 2012 Report at 320. The Commission distinguishes between impersonal file-sharing exchanges, which involve "anonymous, indiscriminate" open exchange and no two-way communication, versus "personal" distribution in closed groups, involving two-way communication concerning child pornography and child exploitation. *Id.* at 313-14, 324.

*Conduct*

The third factor asks courts to assess whether an offender "has a history of engaging in sexually abusive, exploitative, or predatory conduct in addition to his child pornography offense." 2012 Report at 320. Notably, the Commission recommends that, in addition to criminal offenses, courts consider "non-criminal acts of sexually deviant behavior" because such behavior also indicates sexual dangerousness. *Id.* at. 325.

As described in this sentencing memorandum, the aggravating factors articulated by the sentencing commission would be applicable in the instant matter. When evaluating Mr. Day's content, the statement of offense establishes that while this is a relatively lower volume, the sexual conduct is extreme (including CSAM involving videos of pre-pubescent children who are being

penetrated by adults and CSAM specific to what Mr. Day had sought to do with the UC's purported 9 year-old-daughter), the age is extremely young, and Mr. Day actively is in discussion about the abuse of a child with the UC. As it relates to community, Mr. Day engages with others on both an individual and group level. Mr. Day acknowledges that he was in a group where he received child pornography. He then actively discusses the abuse of a 9 year-old-child with the UC in a one-on-one conversation. Mr. Day has these one-on-one and group engagements with people across encrypted applications like Teleguard and Telegram, and even tries to confirm that the UC is not law enforcement in their conversation, demonstrating knowledge of his wrongful acts and his efforts to avoid detection. Finally, as to conduct, the defendant's first image was downloaded as early as May 13, 2024, and the six identified videos were all downloaded while talking with the UC between October 8 and October 10, 2025, when Mr. Day was making plans to meet up with the UC to engage in sexual activities with the UC's purported nine-year-old daughter.

It is unclear what other images or videos Mr. Day engaged in between May 13, 2025, and October 10, 2025, when he was arrested, but chose not to save to his phone. However, the length of time (well over a year), his comfort in engaging with the UC on a chat about raping his purported 9-year-old daughter, and his efforts to meet up with the UC engage sexually with the UC's 9-year-old daughter all demonstrate that his conduct is not limited to a one-time lapse in judgement but rather represent a sustained engagement in the trafficking of child pornography.

Even if the Court is inclined to not apply enhancements as outlined by the sentencing manual to Mr. Day's case and instead apply these three aggravators to Mr. Day's conduct, the

application of these factors should result in the defendant receiving a guideline-compliant sentence.[2]

## II. Sentencing Guidelines Calculation

The government agrees with the Guidelines calculation set forth in the Presentence Report, estimating a final offense level of 31 and a Guidelines range of 108 to 135 months of incarceration.

## IV. Government's Sentencing Recommendation

The government recommends a guidelines compliant sentence of 120 months of incarceration, to be followed by 10 years of supervised release. This sentence aligns with the sentencing factors outlined in 18 U.S.C. § 3553(a) and is sufficient, but not greater than necessary, to reflect the seriousness of the offense, to promote respect for the law, as well as to ensure a balance of justice to all individuals involved, and to provide the defendant with necessary rehabilitation measures.

## V. The § 3553(a) Factors Support a Sentence of 120 Months of Incarceration.

### A. Nature and Circumstances of the Offense

The Defendant's conduct is extremely serious. The Defendant pled guilty to transportation of child sexual abuse material ("CSAM"). Unlike a defendant whose conduct is limited to passive possession, the Defendant's trafficking in CSAM was made more egregious by his plan to engage in the sexual abuse of a 9-year-old child.

When the UC and Mr. Day are speaking, Mr. Day appears to be actively downloading the CSAM he would later bring with him to the meet up with the UC. On October 8, 2025, when Mr. Day asks, "Any pics? Free tonight?," the UC responds with a purported picture of the nine-year-

[2] The government believes that the sentencing factors do apply and should be applied. However, the government provides an alternative argument in an abundance of caution due to differing views among judges about which enhancements should apply in child pornography trafficking cases.

old daughter (Mr. Day places a 'fire' emoji on the picture). At 3:34pm, the U.C. says "unfortunately not free tonight." The UC, at 3:42pm, specifically states, "Don't want it to be weird Friday so I want to make sure that age is not going to be an issue." Mr. Day, at 3:43pm, responds, It won't be weird. Its not an issue for me." The UC, at 3:44pm, states, "Ok and she's 9 and when we play it's more like a game you cool with that." At 3:45pm, Mr. Day replies, "Yeah. How does the game usually go? So I know exactly what to do or say." The UC at 3:47pm responds, "Awesome usually tickling then move forward from there what would you want to do? How far." Mr. Day replies at 3:48pm, How far has she gone. At that time, Mr. Day apparently downloads from telegram a video containing CSAM, Video File: 1_4940957268108641782 – a two-minute and two-second video file depicting an adult black male orally penetrating a prepubescent girl with his erect penis.

The UC and Mr. Day continue their conversation where the UC at 3:49pm says "Loves oral and she rides me [referring to the fictitious 9-year-old). Mr. Day responds, "Nice. I love oral." The conversation continues between the UC and Mr. Day, as further described above, about the plan for their meet-up and what Mr. Day would want the 9-year-old to do to him. Mr. Day tells the UC, "Oral is cool. We can work in to other stuff, the more I visit" and affirms "Definitely won't be one time." The same night, Mr. Day downloads a second CSAM video at 6:23pm (Video File: e5d223a0-a492-11f0-bdd2-a58c4d17df7f – a twenty-nine-second video file depicting an adult male's erect penis is penetrating the prepubescent girl's anus).

On October 10, 2025, at 7:48am, Mr. Day downloads three additional videos from telegram and teleguard (Video File: d5f5ff00-a5ce-11f0-b006-2960499a9355; Video File: d5f62610-a5ce-11f0-8d23-c5046b306b95; and Video File: d5f62610-a5ce-11f0-8823-1d2dc68651e3, all

described above). Just prior, Mr. Day texted the UC, "Where do you usually finish, when playing?"

Using Teleguard and Telegram, the Defendant received and engaged with CSAM, saving certain images and videos directly to his phone. Mr. Day made active plans to travel (and did travel) to Washington, D.C. to meet with a UC for the purpose of engaging in sex with a purported 9-year-old girl. During his conversations with the UC, Mr. Day was actively viewing child pornography and saving some of those files to his phone, some of which depict extremely similar behavior to that which he was seeking with the 9-year-old.

This is not a defendant who stumbled upon CSAM or who made a one-time error in judgment. The Defendant's statements and actions reflect a sustained pattern of seeking out CSAM, cultivating relationships with similarly minded individuals, and shows a step towards hands-on abuse. But for his behavior being interrupted by the work of undercover law enforcement officers, it is likely his behavior would have continued to escalate.

The real-world impacts of trafficking in child pornography are severe. First, it perpetuates an immense psychological toll on the child depicted in the video. Each video and image the Defendant possessed, received, and transported depicts the sexual abuse of an actual child, and every act of redistribution and engagement inflicts a renewed violation on that child, whose abuse is preserved and recirculated indefinitely for the gratification of others.

Second, possession, solicitation, and transportation of CSAM perpetuate a market and demand for CSAM to be produced. Mr. Day's actions directly contributed to the sexual abuse and production of that sexual abuse of new victims. Mr. Day's plan to travel and engage in hands-on abuse with a purported 9-year-old child make the nature and circumstances of Mr. Day's actions even more concerning.

The nature and circumstances of Mr. Day's crimes support a sentence of 120 months of incarceration followed by 10 years of supervised release as both justified and necessary.

**B. History and Characteristics of the Defendant**

The defendant has a limited criminal history, involving convictions for possession of marijuana in Baltimore County, MD (2010) and Alexandria, Virginia (2018). He has no criminal history involving the sexual abuse of children.

However, the defendant's lack of criminal history does not equate to no prior criminal conduct. The defendant was active on a website where he stated that he was "very much into taboo (devil emoji)" and that he has "no hard limits." Moreover, the defendant admits to receiving child pornography via telegram from other telegram users. While he told the law enforcement officers interviewing him that he would delete child pornography sent to him, he did not indicate that he ever reported the people distributing child pornography to him on telegram or provide any explanation as to why he is receiving child pornography on various occasions.

Through his chats with the UC, Defendant showed an interest in hands-on abuse of a child. Moreover, Mr. Day took active steps to engage in that hands-on abuse, traveling to Washington, DC and persisting in that effort to travel even when his car broke down. When the UC offered to wait or reschedule, it was Mr. Day that kept pushing to make this meeting happen.

[redacted]

[redacted] The government's proposed sentence followed by an additional term of supervised release will provide the necessary treatment and rehabilitation to support Mr. Day in addressing the underlying concerns highlighted here while protecting the community, particularly children.

The Defendant's actions and statements support a sustained pattern of engagement with CSAM that would have likely continued, and may well have escalated, but for his interactions the UC leading to his arrest.

**C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and Provide Just Punishment for the Offense**

The government's recommended sentence in this case would promote respect for the law and provide just punishment for Mr. Day's offenses. 18 U.S.C. § 3553(a)(2)(A). As the Eleventh Circuit explained in *United States v. Irey*, 612 F.3d 1160, 1206 (11th Cir. 2010):

> This purpose--essentially the "just des[s]erts" concept--should be reflected clearly in all sentences; it is another way of saying that the sentence should reflect the gravity of the defendant's conduct. From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing a recurrence of the offense.

Child pornography offenses are extremely serious because they result in perpetual harm to the most vulnerable victims, while simultaneously validating and normalizing the sexual exploitation of children. Courts across the country have recognized this:

> There can be no keener revelation of a society's soul than the way in which it treats its children. Given the current statistics surrounding child pornography, we are living in a country that is losing its soul.
>
> Child pornography is a vile, heinous crime. Mention the term to your average American and he responds with immediate disgust and a sense of unease. However, once it enters the legal system, child pornography undergoes sterilization. The sterilization goes far beyond properly removing emotion from sentencing decisions. Images are described in the most clinical sense. Victims all too often remain nameless. The only emotions on display are those of the defendants, sorry that their actions were discovered by law enforcement.

*United States v. Cunningham*, 680 F.Supp.2d 844, 847 (N.D. Ohio, 2010), *affirmed* 669 F.3d 723 (6th Cir. 2012).[3]

When enacting mandatory minimum penalties for those who produce and traffic in the sexual abuse and exploitation of children, Congress similarly described the evil of child pornography:

> [W]here children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years . . . [The] existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children . . . it inflames the desires of . . . pedophiles . . . who prey on children, thereby increasing the creation of and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials.

---

[3] *See also In re Amy Unknown*, 636 F.3d 190, 201 n.12 (5th Cir. 2011) (*citing United States v. Norris*, 159 F.3d 926 (5th Cir. 1998) (describing how the distribution of child pornography creates a marketplace for images of children, perpetuating abuse); *United States v. Yuknavich*, 419 F.3d 1302, 1310 (11th Cir. 2005); *United States v. Grosenheider*, 200 F.3d 321, 332-34 (5th Cir. 2000).

Child Pornography Prevention Act of 1996, Pub.L. No. 104-208, § 121, 110 Stat. 3009, 3009-27 (1996).

The gravity of trafficking in child sexual abuse material cannot be overstated. As the Supreme Court recognized in *New York v. Ferber*, 458 U.S. 747, 759 (1982), "the distribution of photographs and films depicting sexual activity by juveniles is intrinsically related to the sexual abuse of children in at least two ways. First, the materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation. Second, the distribution network for child pornography must be closed if the production of material which requires the sexual exploitation of children is to be effectively controlled."

Traffickers of child pornography, like the defendant, create a market and demand for materials depicting the sexual abuse and exploitation of real children. They contribute to the cycle of abuse and are in part responsible for the harm suffered by the children used to produce the materials in their collections. *See United States v. Goff,* 501 F.3d 250, 259-260 (3d Cir. 2007) ("Children are exploited, molested, and raped for the prurient pleasure of [defendant] and others who support suppliers of child pornography"). In *United States v. Goldberg,* the Seventh Circuit stated:

> The district judge was influenced by the erroneous belief that a sentence affects only the life of the criminal and not the lives of his victims. Young children were raped in order to enable the production of the pornography that the defendant both downloaded and uploaded-both consumed himself and disseminated to others. The greater the customer demand for child pornography, the more that will be produced. [Citations omitted].

491 F.3d 668, 672 (7th Cir. 2007). In other words, even if consumers of child pornography do not themselves molest children, their actions directly contribute to the abuse of children. Significant

incarceration is necessary to promote respect for the law, ensure just punishment, and to reflect the seriousness of the defendant's offenses.

The government's proposed sentence would provide just punishment for these offenses, promote respect for child sexual abuse and exploitation laws, and reflect the seriousness of the defendant's offense and offenses against minor victims in general.

The Defendant was a participant in and contributor to that market. He actively sought out communities of like-minded offenders, engaged in CSAM across multiple encrypted platforms, engaged with individuals interested in CSAM, and even made efforts to meet up with a child in the non-digital world.

The U.S. Sentencing Commission has recognized that these offenses inflict what it described as "substantial and indelible harm" on the children who are victimized. United States Sentencing Commission, *Report to the Congress: Federal Child Pornography Offenses* (Dec. 2012). That harm is not limited to the moment of production. Research consistently shows that victims suffer ongoing psychological injury each time their images are redistributed and viewed. This is harm that endures into adulthood and victims describe it as a form of perpetual re-victimization. As the Chair of the Victims Advisory Group to the United States Sentencing Commission stated, "the proliferation of child abuse images increases the risk of future victimization and harms the victims who are the subject of those images" because "repeated exposure to those images normalizes the sexual assault of children, promoting cognitive distortions." *Id.*, App. D (statement of Chair, Victims Advisory Group).

The government's recommended sentence would reflect the true gravity of this conduct, promote respect for the laws enacted to protect children from this cycle of abuse, and ensure just punishment for an offense whose victims continue to suffer its consequences indefinitely.

**D. Adequate Deterrence and Protection of the Public**

CSAM trafficking offenses create a public safety risk for two reasons: 1) the overlap between individuals who engage in online trafficking of CSAM and individuals who engage in hands-on child sexual abuse and 2) the difficulty of detecting these crimes and monitoring compliance with conditions of release. Because of underreporting, it is difficult to obtain accurate statistics regarding the number of individuals who have committed CSAM trafficking offenses and also committed hands-on abuse. A 2012 report released by the United States Sentencing Commission showed that approximately one in three non-production CSAM offenders had engaged in one or more types of criminal sexually dangerous behavior in addition to the charged CSAM offense. The Commission defined "criminal sexually dangerous behavior" as actual or attempted contact sex offenses, non-contact sex offenses, and prior non-production child pornography offenses. U.S. Sent'g Comm'n, Report to the Congress: Federal Child Pornography Offenses, 314-315 (2012); https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf. One significant study on this topic conducted by M.C. Seto, et al. conducted two meta-analyses to estimate the extent of hands-on sexual offending among individuals who sexually offended online. The study looked at 4464 men who committed online sexual offenses which were mostly CSAM trafficking. The findings of the study revealed that 12% of the 4464 men had a history of hands-on offenses based strictly on official records including arrests and convictions. However, the study also interviewed a sub-sample of 523 men involved in CSAM trafficking offenses. One in two men within that subgroup, a total of 55%, admitted to perpetrating offline contact sexual offenses against minors. M.C. Seto, R.K. Hanson

& K.M. Babchishin, *Contact Sexual Offending by Men with Online Sexual Offenses*, 23.1 Sexual Abuse: A Journal of Research and Treatment 124-45 (2011).

Another study conducted by Matthew DeLisi studied 216 federal offenders who were on supervised release between 2016 and 2020. Of the 216 group members, 109 had previously been charged with a sexual contact offense and 107 had been charged with non-contact CSAM offenses and had no prior arrests for contact offenses. 59% of the individuals convicted of CSAM offenses admitted to a prior contact sex offense for which they had never been charged. Dury A. J., Elbert M. J., & DeLisi M., *The Dark Figure of Sexual Offending: A Replication and Extension*, 38.6 Behavioral Sciences & the Law 559-570 (2020).

This data is consistent with cases in this district where defendants who engage in CSAM trafficking offenses also engage in hands-on abuse. *United States v. Allen Love*, 07-cr-27 (RBW) (in 2007, the defendant was sentenced for transportation of child pornography for distributing CSAM to an undercover agent and subsequently violated supervised release in 2024 for contacting minors to meet them for sex); *United States v. Charles Hilton*, 24-cr-554 (ACR) (defendant, who was previously convicted of endangering the welfare of a child, was sentenced in 2025 for uploading CSAM of a minor child he abused in addition to large quantities of CSAM he found on the internet); *United States v. Linwood Barnhill*, 25-cr-149 (JMC) (defendant, who was previously convicted of possession of child pornography and pandering, was sentenced in 2026 for sex trafficking minors). Because of the link between CSAM offenders and offenders who engage in hands-on abuse, there is a serious risk of danger posed by CSAM offenders to children in the real world.

Moreover, there have been cases in this District which demonstrate the difficulty in detecting these offenses. In *United States v. Bayo Bakare*, 23-cr-385 (TNM), the defendant was on supervised release following a conviction for Distribution of Child Pornography. The United States Marshal Service conducted a compliance check at Bakare's residence and recovered a phone that he was not authorized to have. The phone contained multiple images of child pornography. But for the compliance check conducted by law enforcement agents, Bakare's conduct would have gone undetected.

A significant sentence is necessary to achieve adequate deterrence, both specific and general. 18 U.S.C. § 3553(a)(2)(B). With respect to specific deterrence, Mr. Day's sustained conduct demonstrates a persistent engagement with CSAM that was escalating to hands-on abuse.

Additionally, the Supreme Court has long recognized that penalizing those who traffic in child pornography reduces the demand that sustains its production, and that reducing demand is one of the most effective tools for reducing the number of children subjected to abuse. *Osborne v. Ohio*, 495 U.S. 103, 109-10 (1990). A sentence that does not meaningfully punish trafficking of CSAM, particularly in light of the escalation to potential hands-on abuse, signals to the many participants in that market that such conduct carries acceptable risks, encouraging others to engage in or continue similar behavior. General deterrence is particularly important in CSAM cases, where conduct can go undetected for long periods of time, particularly with sophisticated actors like Mr. Day, who used encrypted tools to hide their illegal actions.

A sentence of 120 months is necessary and appropriate to deter both this Defendant and others who engage in, or contemplate engaging in, the organized trafficking of CSAM.

**E. Kinds of Sentences Available and the Need to Avoid Unwarranted Sentencing Disparities**

Section 3553(a)(6) requires courts to consider the need to avoid unwarranted sentencing disparities among defendants "with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). However, it "does not require the district court to avoid sentencing disparities . . . between [] defendants who might not be similarly situated." *United States v. Mattea*, 895 F.3d 762, 768 (D.C. Cir. 2018) (quoting *United States v. Guillermo Balleza*, 613 F.3d 432, 435 (5th Cir. 2010)).

Here, the U.S. Sentencing Commission's Judicial Sentencing Information shows that the average sentence length for individuals sentenced under U.S.S.G. § 2G2.2 with a final offense level of 31 and Criminal History Category I was 90 months during Fiscal Years 2021–2025. The median sentence length was 87 months.

U.S.S.G. § 2G2.2 covers a wide range of behavior, including possession, receipt, transportation, and distribution of child pornography, among other conduct. The Defendant pled guilty to transportation of CSAM, and his actions were not those of a passive participant or mere bystander. Moreover, the defendant's conduct is even more concerning in the context of his travel to Washington, D.C. for the purpose of engaging in sexual acts with a purported 9-year-old child. The Defendant's actions place him as one of the more serious actors in the wide range of behavior contemplated by U.S.S.G. § 2G2.2.

A sentence of 120 months appropriately accounts for the entire context of Mr. Day's conduct while avoiding unwarranted disparity with similarly situated defendants.

**F. Restitution**

In child pornography cases, restitution is mandatory to any person "harmed as a result of" a defendant's crime. See 18 U.S.C. § 2259(a), (c); see also *United States v. Monzel*, 930 F.3d 470,

476 (D.C. Cir. 2019); *United States v. Hite*, 113 F. Supp. 3d 91, 94 (D.D.C. 2015) ("Pursuant to 18 U.S.C. § 2259, the victims of certain federal crimes, including possession of child pornography, are entitled to mandatory restitution."). Restitution includes "the full amount of the victim's losses," which may include any costs incurred by the victim for:

> (A) Medical services relating to physical, psychiatric, or psychological care;
> (B) Physical and occupational therapy or rehabilitation;
> (C) Necessary transportation, temporary housing, and childcare expenses;
> (D) Lost income;
> (E) Attorneys' fees, as well as other costs incurred; and
> (F) Any other losses suffered by the victim as a proximate result of the offense.

18 U.S.C. § 2259(a), (b)(3); *see also United States v. Hite*, 113 F. Supp. 3d 91, 94 (D.D.C. 2015).

Transportation of Child Pornography is a child pornography trafficking offense, as defined in 18 U.S.C. § 2259(c)(3). Therefore, the Court shall determine the full amount of the victim's losses and shall order restitution in an amount that reflects the Defendant's relative role in the causal process that underlies the victim's losses, but which is not less than $3,000. 18 U.S.C. § 2259(b)(2).

In *Paroline v. United States*, 134 S. Ct. 1740 (2014), the United States Supreme Court faced a circuit split over the interpretation of 18 U.S.C. § 2259, specifically over "how to determine the amount of restitution a possessor of child pornography must pay to the victim whose childhood abuse appears in the pornographic materials possessed." *Paroline*, 134 S. Ct. at 1716. In *Paroline*, the defendant possessed two images of the victim who was seeking restitution. The Court's answer to this question involved three steps.

First, *Paroline* held that, because the statute defined a "victim" as someone "harmed as a result" of the offense, restitution under § 2259 was proper "only to the extent the defendant's offense proximately caused a victim's losses." *Id*. at 1722.

Second, the Court held that "proximate cause" under § 2259 did not require strict but-for causation. *Id*. at 1726-27. The Court recognized that in most child pornography possession cases, a victim's losses resulted from harm caused by the trafficking of his or her images by numerous "geographically and temporally distant offenders acting independently, and with whom the defendant had no contact." *Id.* at 1727. As a result, the Court held that:

> In this special context, where it can be shown that a defendant possessed a victim's images and that a victim had outstanding losses caused by the continuing traffic in those images but where it is impossible to trace a particular amount of those losses to the individual defendant by recourse to a more traditional causal inquiry, a court applying § 2259 should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses.

*Id*. at 1725. The Court made clear that, where the victim's losses are "the product of the acts of thousands of offenders," a restitution order should not be "too severe" but must not be merely "a token or nominal amount." *Id.* That is, in part, because a restitution order under § 2259 serves "twin goals," the first being to "help[] the victim achieve eventual restitution for all her child-pornography losses" and second to "impress[] upon offenders the fact that child pornography crimes, even simple possession, affect real victims." *Id.*

Third, the Court provided sentencing courts with the guidance regarding how to determine the proper amount of restitution under this standard. The Court noted that a sentencing court's goal should be to assess "the significance of the individual defendant's conduct in light of the broader causal process that produced the victim's losses," taking into account any "available evidence." *Id*. at 1727-28. The Court emphasized that there is no "precise mathematical inquiry" governing this determination and that district courts must exercise "discretion and sound judgment" in fashioning restitution awards. *Id*. at 1728. The Court suggested several factors to be considered, including: (1) the number of defendants convicted of possessing the victim's images; (2) the

number of future offenders likely to be caught and convicted; (3) whether the defendant had any role in the initial production of the images; (4) whether the defendant reproduced or distributed the images; (5) how many images the defendant possessed; and (6) "other facts relevant to the defendant's relative causal role." *Id*. "These factors need not be converted into a rigid formula, especially if doing so would result in trivial restitution orders. They should rather serve as rough guideposts for determining an amount that fits the offense." *Id*. Congress has since amended Section 2259 to both codify *Paroline*'s basic approach and to set a restitution floor of $3,000. *See* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299, 132 Stat. 4383 (2018).

The Government will submit a separate filing including restitution requests on behalf of any known victims who have requested restitution in this matter.

**CONCLUSION**

For the foregoing reasons, the government respectfully recommends that the defendant be sentenced to a term of incarceration of 120 months, followed by 10 years of supervised release. Such a sentence contemplates not only the relevant guidelines range set forth for this offense, but also adequately reflects the factors as outlined in 18 U.S.C. § 3553(a).

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

*/s/ Richard Kelley*

Richard S. Kelley
DC Bar No. 1026390
Assistant United States Attorney
601 D St NW
Washington, DC 20530
(202) 834-3571
richard.kelley2@usdoj.gov